TaiDoc Tech. Corp. v. OK Biotech Co., Ltd., 2016 NCBC 26.

| | |
|---|---|
| STATE OF NORTH CAROLINA<br><br>MECKLENBURG COUNTY | IN THE GENERAL COURT OF JUSTICE<br>SUPERIOR COURT DIVISION<br>12 CVS 20909 |

TAIDOC TECHNOLOGY
CORPORATION,

            Plaintiff,

v.

OK BIOTECH CO., LTD.,

            Defendant.

**ORDER AND OPINION ON
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

{1}    **THIS MATTER** is before the Court upon Defendant OK Biotech Co., Ltd.'s ("OK Biotech") Motion for Summary Judgment pursuant to Rule 56 of the North Carolina Rules of Civil Procedure (the "Motion") seeking dismissal of all claims brought by Plaintiff TaiDoc Technology Corporation ("TaiDoc") in the above-captioned case. Having considered the Motion, the briefs in support of and in opposition to the Motion, the record evidence submitted by the parties, and the arguments of counsel at a hearing on this matter, the Court hereby **DENIES in part** and **GRANTS in part** the Motion.[1]

> *Erwin, Bishop, Capitano & Moss, P.A., by Joseph W. Moss, Jr. and J. Daniel Bishop, for Plaintiff TaiDoc Technology Corporation.*
>
> *Foley & Lardner LLP, by Michael J. Lockerby, George Beck, and Brian J. Kapatkin, and Clements Bernard PLLC, by Christopher L. Bernard and Lawrence A. Baratta, Jr., for Defendant OK Biotech Co., Ltd.*

Bledsoe, Judge.

---

[1] After briefing on the Motion was completed, OK Biotech filed a Motion for Leave to Supplement Exhibit No. 1 to its Summary Judgment Motion (the "Motion for Leave to Supplement"), in which OK Biotech sought to supplement a North Carolina Rule of Evidence 1006 summary based on arguments OK Biotech contends TaiDoc made for the first time in its Sur-reply opposing the Motion for Summary Judgment. Having considered the parties' briefs in support of and in opposition to the Motion for Leave to Supplement, the Court grants the Motion for Leave to Supplement and considers OK Biotech's Exhibit A to the Motion for Leave to Supplement in resolving the Motion for Summary Judgment.

## I.

## INTRODUCTION AND PROCEDURAL HISTORY

{2} This case involves a dispute between two manufacturers of blood glucose meters and test strips used by diabetic patients to measure the concentration of glucose in their bloodstream. Plaintiff TaiDoc Technology Corporation ("TaiDoc") claims that OK Biotech engaged in a conspiracy with Diagnostic Devices, Inc. ("DDI") to obtain confidential and trade secret information from TaiDoc in order to manufacture and sell its own test strips and meters based on TaiDoc's technology.

{3} TaiDoc initiated this action in 2012, asserting claims against OK Biotech for civil conspiracy to commit fraud, facilitating fraud, aiding and abetting fraud, misappropriation of trade secrets under N.C. Gen. Stat. § 66-152 *et seq.*, unfair and deceptive trade practices in violation of N.C. Gen. Stat. § 75-1.1, tortious interference with contract, tortious interference with prospective economic advantage, and unjust enrichment. Relevant factual and procedural background of this case is recited in detail in *TaiDoc Tech. Corp. v. OK Biotech Co., Ltd.*, 2015 NCBC LEXIS 74 (N.C. Super. Ct. July 17, 2015), *TaiDoc Tech. Corp. v. OK Biotech Co., Ltd.*, 2015 NCBC LEXIS 27 (N.C. Super. Ct. Mar. 16, 2015) and *TaiDoc Tech. Corp. v. OK Biotech Co., Ltd.*, 2014 NCBC LEXIS 49 (N.C. Super. Ct. Oct. 9, 2014). The facts pertinent to the resolution of the present Motion are set forth below.

{4} OK Biotech's Motion, which seeks summary judgment dismissing all claims, has been fully briefed, a hearing has been held, and the Motion is now ripe for resolution.

## II.

## FACTUAL BACKGROUND

{5} The Court does not make findings of fact on motions for summary judgment under Rule 56. *See Hyde Ins. Agency, Inc. v. Dixie Leasing Corp.*, 26 N.C. App. 138, 142, 215 S.E.2d 162, 164–65 (1975). Rather, the Court summarizes facts, noting both the facts that it believes are undisputed and others that it believes are contested, in order to provide context for the claims and the motion. *Id.* In ruling on a motion under Rule 56, "the trial court must view all evidence in the light most

favorable to the non-movant, accepting the latter's asserted facts as true, and drawing all reasonable inferences in its favor." *Anderson v. Demolition Dynamics, Inc.*, 136 N.C. App. 603, 605, 525 S.E.2d 471, 472 (2000).

### The TaiDoc-DDI Relationship

{6}     TaiDoc, a Taiwanese corporation, is an original design manufacturer of blood glucose meters and test strips. It designs and manufactures its own products and sells them to distributors throughout the world. (Chou Aff. Ex. A ¶ 4.)

{7}     In 2005, TaiDoc began manufacturing glucose meters and test strips for sale and distribution in the United States by DDI, a distributor of diabetic products located in Charlotte, North Carolina, under DDI's Prodigy brand. On March 1, 2006, TaiDoc entered into a Sales Exclusive Agreement with DDI (the "SEA"), which provided that DDI would serve as TaiDoc's "sole and exclusive distributor" of DDI's Prodigy branded meters and strips in the United States. (*See* Def.'s Mot. Summ. J. App. Ex. 9, hereinafter "SEA".)

{8}     The SEA contained a confidentiality provision that provided that "[e]ach party acknowledges that in the course of performing its obligations hereunder it will receive information which is confidential and proprietary to the other party. Each party agrees not to use such information except in the performance of this Agreement and not to disclose such information to third parties." (SEA ¶ 17.1.) Confidential information was defined in the SEA to include "the terms of this Agreement, the parties' current and future business plans, and other information which is stamped or marked as confidential[.]" (SEA ¶ 17.2.)

{9}     Before certain medical devices such as blood glucose meters and test trips can be imported and sold in the United States, each product must be registered with the United States Food and Drug Administration ("FDA") using a 510(k) Premarket Notification ("510(k)"). Before TaiDoc and DDI entered into the SEA, on December 21, 2005 and February 21, 2006, respectively, TaiDoc, at DDI's request, prepared and filed two 510(k)s in DDI's name, both of which were cleared by the FDA in July 2006. TaiDoc contends that these 510(k)s contained TaiDoc's confidential

information.  In October 2007, TaiDoc submitted a third 510(k) in DDI's name (the "Third 510(k)").  (Chou Aff. ¶ 13.)

The DDI-OK Biotech Relationship

{10}    Beginning in September 2007, DDI began searching for one or more manufacturers to replace TaiDoc as the manufacturer of its Prodigy glucose meters and test strips.   DDI approached a number of potential manufacturers, and ultimately began soliciting Defendant OK Biotech to replace TaiDoc.  (Wang Dep. 13:19–15:13; Lai Dep. 32:7–33:3.)  At the time DDI began soliciting OK Biotech, OK Biotech did not manufacture or sell a test strip compatible with TaiDoc products.  (Reqs. Admis. 1–2.)  It is undisputed that at this time OK Biotech knew that TaiDoc was a supplier of glucose meters and strips to DDI, but OK Biotech contends that it did not know the terms of any specific contract or agreement governing DDI's relationship with TaiDoc.  (Def.'s Mot. Summ. J. App. Ex. 14.)

{11}    During the course of discussions between OK Biotech and DDI, DDI sent OK Biotech samples of TaiDoc meters and test strips.  (Pl.'s Dep. Ex. 37.)  Upon receiving these samples, on September 17, 2007, OK Biotech indicated to DDI that OK Biotech could "do the same products if based on production technology," stating that "[w]e would like to work with you on this issue." (Pl.'s Dep. Ex. 37.)  A few days later, OK Biotech requested from DDI by e-mail additional samples of TaiDoc meters and strips, as well as a circuit diagram, flow charts, code data, and vocal memory size.  (Pl.'s Dep. Ex. 39.)  In the same e-mail, OK Biotech indicated that it "hope[d] to change the outlook of the strip and character a little bit.  For we don't want it [to be] exactly [the] same as Taidoc." (Pl.'s Dep. Ex. 39.)

{12}    In response, DDI sent to OK Biotech more samples of TaiDoc strips and meters with code, and indicated to OK Biotech that DDI would send it a copy of the 510(k) TaiDoc applied for in DDI's name, which DDI advised it would have to request from the FDA.  (Pl.'s Dep. Ex. 39.)  DDI also indicated that it planned to import OK Biotech products under its existing 510(k)s. (Pl.'s Dep. Ex. 39.)  DDI later sent documents to OK Biotech in response to OK Biotech's requests, some of which were expressly labeled as TaiDoc's "CONFIDENTIAL and PROPRIETARY

information" and at least one of which was expressly labeled as "Confidential" and a "trade secret." (Pl.'s Dep. Ex. 6.) TaiDoc alleges that OK Biotech used these documents in developing OK Biotech's Prodigy test strips for DDI. (Lin Aff. ¶ 10.)

{13} On September 26, 2007, OK Biotech e-mailed DDI that "[w]e know the history of Taidoc very much. However, we don't know the code table. What content in the code card and what is the parameter? It's very important to know to make the meter." (Pl.'s Dep. Ex. 41.) DDI responded by providing information concerning the details of TaiDoc's manufacturing processes that TaiDoc claims is confidential and a trade secret. (Pl.'s Dep. Ex. 41.) OK Biotech continued to seek information from DDI about TaiDoc's code table, and eventually sent DDI a sample of what OK Biotech wanted DDI to request from TaiDoc. (Pl.'s Dep. Exs. 46–47.) OK Biotech also requested information from DDI concerning TaiDoc's pricing. (Pl.'s Dep. Ex. 42.)

{14} On October 9, 2007, DDI representatives traveled to Taiwan to meet with representatives of OK Biotech. (Lin Aff. ¶ 9.) Minutes from this meeting and e-mail communications between representatives immediately after the meeting suggest that DDI and OK Biotech formalized a business relationship at this meeting, after which DDI e-mailed OK Biotech advising that DDI was "very happy and excited of our new partnership." (Pl.'s Dep. Exs, 16, 49.) In late November 2007, representatives of OK Biotech traveled to Charlotte to meet again with DDI representatives. (Pl.'s Dep. Ex. 14.) Minutes from that meeting reflect that DDI and OK Biotech shared a mutual goal to "[t]arget win over Taidoc." (Pl.'s Dep. Ex. 14.)

{15} On April 23, 2008, OK Biotech and DDI memorialized their relationship by entering into agreements titled "Binding Term Sheets," whereby OK Biotech agreed to manufacture and sell blood glucose test strips and meters exclusively for DDI. (Pl.'s Dep. Exs. 19, 20.) The Binding Term Sheets provided that "[c]onfidentiality means everything" and further that "OK [Biotech] will not have the right to even tell anyone that OK Biotech is selling or making products for DDI." (Pl.'s Dep. Exs. 19, 20.)

<u>DDI's Alleged Misrepresentations to TaiDoc</u>

{16}    During the course of DDI's negotiations with OK Biotech, TaiDoc alleges that DDI knowingly made various false statements and representations to TaiDoc, including the following:

i.    On December 3, 2007, DDI executed a Second Addendum to the SEA, which provided that "[t]he Parties commit themselves to treat information, documents etc., they have received indirectly or directly in the context of the negotiations about financial or other business nature . . . strictly confidential and will not in any form forward it to third Parties subject to Article 17 of the [SEA]." (Chou Aff. Ex. A3 ¶ A5.)

ii.    On December 14, 2007, DDI e-mailed TaiDoc and indicated that it was "totally committed to Taidoc and [wanted] to put all [its] efforts to grow and bring huge business to Taidoc[.]" (Chou Aff. Ex. C8.)

iii.    On December 20, 2007, DDI e-mailed TaiDoc that it was "extremely committed to support TaiDoc with all its product line, [and] hope . . . to always be an extension of taidoc in the US market[.]" (Chou Aff. Ex. C11.)

iv.    On December 31, 2007, DDI e-mailed TaiDoc: "[W]e are 100% committed to [TaiDoc's] product and it is not like we can walk away to another supplier and buy strip from them . . . . Our business model is only working on exclusivity this is what we have started the relation with Taidoc on . . . ." (Chou Aff. Ex. C13.)

v.    On January 19, 2008, DDI e-mailed TaiDoc: "[W]e both are partner in this business and if Taidoc does not trust us as a partner, I think it is very difficult for us to grow the business." (Chou Aff. Ex. C15.)

vi.    On July 12, 2008, DDI e-mailed TaiDoc: "It is extremely important for our business and growth that we enjoy a good relation with our suppliers and partners, in addition Taidoc is not only a supplier they are an extension to our company." (Chou Ex. C17.)

vii. On September 11, 2008, although DDI and OK Biotech had planned to "be out of Taidoc" by October 2008, (Pl.'s Dep. Ex. 79), DDI e-mailed TaiDoc contemplating the existence of an ongoing relationship between the two, (Chou Aff. Ex. C20).

**OK Biotech Begins Manufacturing Meters and Strips for DDI**

{17} In July 2008, DDI and OK Biotech exchanged e-mails reaffirming DDI's decision to import OK Biotech's products under DDI's existing 510(k)s—each of which had been prepared by TaiDoc—and neither DDI nor OK Biotech obtained a new 510(k) for Prodigy meters or strips manufactured by OK Biotech. (Pl.'s Dep. Ex. 107.) At that same time, OK Biotech and DDI exchanged e-mails in which DDI stated that "[o]ur job is to kill Taidoc," that "Okbiotech' will be bigger than Taidoc in 2 years," that "we will scare [customers] to buy taidoc product," and that "[w]e offer you a lowest price to compete with Taidoc in the market." (Pl.'s Dep. Ex. 76.) From 2008 through 2014, neither DDI nor OK Biotech ever filed any document with the FDA to suggest that OK Biotech's strips and meters were different from TaiDoc's products.

{18} OK Biotech began selling strips to DDI in August 2008. (Reqs. Admis. 52.) Because it took longer for OK Biotech to develop a meter than it did strips, DDI also entered into an agreement with another company, Health & Life Co., Ltd. ("H&L"), to develop Prodigy meters. OK Biotech was aware of the agreement between DDI and H&L, and the three communicated during development of the meter in 2008. (*See* Pl.'s Dep. Ex. 140.) DDI requested H&L to develop an autocode meter that was identical to TaiDoc's meter. (Pl.'s Dep. Exs. 133, 136.) DDI simultaneously tasked OK Biotech with developing a voice meter. In August 2008, DDI obtained the 510(k)s that had been prepared by TaiDoc from the FDA and provided them to H&L and OK Biotech with instructions that "[a] lot of the information you need is in the 510(k) I sent you" and advising that meter completion should be each company's high priority. (Pl.'s Dep. Ex. 136, 137.) OK Biotech shipped its first voice meters to DDI on November 26, 2008. (Pl.'s Dep. Ex. 105.) H&L shipped its first autocode meters to DDI on December 16, 2008. (Pl.'s

Dep. Ex. 105.) DDI continued to purchase strips from TaiDoc through December 8, 2008. (Chen 2d Aff. ¶ 30.)

{19} In order to market OK Biotech's products under the Third 510(k), FDA regulations required DDI to demonstrate that OK Biotech's Prodigy test strips were the same as TaiDoc's test strips. (Pl.'s Dep. Ex. 110.) Under FDA regulations, a new 510(k) was required if strip chemistry or meter algorithm changed from the original product. (*See* Pl.'s Dep. Ex. 121); 21 C.F.R. § 807.81(a)(3).[2] In January 2009, DDI asked OK Biotech to complete forms to document a "change of supplier" from TaiDoc to OK Biotech "using the same 510(k)." (Pl's Dep. Ex. 113.) TaiDoc contends that in response, OK Biotech completed paperwork reporting that OK Biotech's meters and strips were the same as TaiDoc's meters and strips to support DDI's submission to the FDA. (Pl.'s Dep. Ex. 114.) OK Biotech's Rule 30(b)(6) representative, James Lai, testified, however, that the TaiDoc and OK Biotech strip chemistry and meter algorithms had always been different. (Lai Dep. 98:7–98:20) ("[O]ur products never have been the same as TaiDoc products.").

{20} In January 2009, during the course of prior litigation between the parties, DDI made OK Biotech aware of the specific language in the confidentiality provision in the SEA. (Pl.'s Dep. Ex. 15.) TaiDoc alleges that OK Biotech continued to use TaiDoc's confidential information thereafter in developing and manufacturing its strips and meters, and to prepare portions of a 510(k) it filed in March 2009. (Lin Aff. ¶¶ 16–22.)

{21} In connection with a 510(k) filing in August 2011, OK Biotech requested and received from DDI a risk analysis originally prepared by TaiDoc. (Pl.'s Dep. Exs. 11–13.) The analysis contained a "Confidentiality Statement" that provided

---

[2] Under 21 U.S.C. § 360(k) and FDA regulations, a new 510(k) premarket notification submission is required for any medical device that is (i) "being introduced into commercial distribution for the first time," with certain qualifications; and (ii) "one that the person currently has in commercial distribution or is reintroducing into commercial distribution, but that is about to be significantly changed or modified in design, components, method of manufacture, or intended use." 21 C.F.R. § 807.81(a) *et seq.* The regulation specifies that "significant changes or modifications that require a premarket identification" are "[a] change or modification in the device that could significantly affect the safety or effectiveness of the device, e.g., a significant change or modification in design, material, chemical composition, energy source, or manufacturing process," or "a major change or modification in the intended use of the device." 21 C.F.R. § 807.81(a)(3)(i), (ii).

that "[t]he information contained in this document is trade secret and confidential. The contents of this file must not be reproduced in any way, nor distributed outside the company or regulatory authorities without express written permission from TaiDoc." (Pl.'s Dep. Ex. 12.)

{22} TaiDoc further alleges that OK Biotech used TaiDoc's confidential information in responding to the FDA in March 2012, (Pl.'s Dep. Ex. 7), and that DDI assigned ownership of the three 510(k)s containing TaiDoc's confidential information to OK Biotech in December 2012.

### The Current Litigation

{23} On May 10, 2012, TaiDoc sued OK Biotech in the United States District Court for the Eastern District of Pennsylvania (the "Federal Action"). The Federal Action was later transferred to the United States District Court for the Western District of North Carolina. TaiDoc asserted claims in the Federal Action for federal unfair competition and false designation of origin under the Lanham Act, 15 U.S.C. § 1125(a), and under Pennsylvania law for misappropriation of trade secrets, unfair trade practices, intentional interference with contractual relationship, tortious interference with prospective economic advantage, fraud, civil conspiracy, and unjust enrichment. (Pl.'s Resp. Br. Ex. 3.)

{24} TaiDoc commenced the current action in this Court on November 16, 2012. That same day, TaiDoc voluntarily dismissed its claims in the Federal Action without prejudice.

III.

LEGAL STANDARD

{25} Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law." N.C. R. Civ. P. 56(c). The moving party has "the burden of showing there is no triable issue of material fact." *Farrelly v. Hamilton Square*, 199 N.C. App 541, 543, 459 S.E.2d 23, 25–26 (1995). The movant may meet this burden "by showing either that: (1) an essential element of the non-

movant's case is nonexistent; or (2) based upon discovery, the non-movant cannot produce evidence to support an essential element of its claim; or (3) the movant cannot surmount an affirmative defense which would bar the claim." *McKinnon v. CV Indus.*, 213 N.C. App. 328, 332, 713 S.E.2d 495, 499 (2011) (citations and internal quotation marks omitted.) In determining whether this burden has been met, the Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *Whitley v. Cubberly*, 24 N.C. App. 204, 206–07, 210 S.E.2d 289, 291 (1974). Our Supreme Court has observed that "summary judgment is particularly inappropriate where issues such as motive, intent, and other subjective feelings and reactions are material and where the evidence is subject to conflicting interpretations." *Creech v. Melnik*, 347 N.C. 520, 530, 495 S.E.2d 907, 913 (1998); *see generally McKee v. James*, 2014 NCBC LEXIS 74, at *13–14 (N.C. Super. Ct. Dec. 31, 2014) (discussing standard).

IV.

ANALYSIS

A.     Misappropriation of Trade Secrets

{26}   The North Carolina Trade Secrets Protection Act ("TSPA") provides the owner of a trade secret a cause of action for misappropriation of that trade secret. N.C. Gen. Stat. § 66-153. "The threshold question in any misappropriation of trade secrets case is whether the information obtained constitutes a trade secret . . . ." *Combs & Assocs. v. Kennedy*, 147 N.C. App. 362, 369, 555 S.E.2d 634, 639 (2001). Under the TSPA, a trade secret is defined as

> business or technical information . . . that: (a) Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.C. Gen. Stat. § 66-152(3). North Carolina courts consider six factors when determining whether information is a trade secret:

> (1) the extent to which the information is known outside the business;
> (2) the extent to which it is known to employees and others involved in

the business; (3) the extent of measures taken to guard the secrecy of the information; (4) the value of the information to business and its competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could properly be acquired or duplicated by others.

*Combs & Assocs.*, 147 N.C. App. at 369–70, 555 S.E.2d at 640.

    i.    <u>TaiDoc's Efforts to Maintain Secrecy</u>

{27}    TaiDoc has identified fourteen documents that it alleges contain trade secret information that OK Biotech has misappropriated. OK Biotech argues that this information does not constitute trade secrets under North Carolina law because the information is in the public domain or readily available from other sources and because TaiDoc has failed to adequately protect the confidentiality of the information. Specifically, OK Biotech contends that (i) TaiDoc lost ownership of any alleged trade secrets that were contained in the 510(k) filings submitted in DDI's name by failing to use the FDA's "Master File" process, (ii) the 510(k) filings were publicly available through Freedom of Information Act ("FOIA") requests, (iii) TaiDoc provided documents to DDI before it had any confidentiality agreement with DDI, and (iv) TaiDoc permitted the delivery of its alleged trade secrets to third parties with no restrictions on subsequent disclosure.

{28}    It is true, as OK Biotech points out, that under North Carolina law "[n]o trade secret will be found if the information is publicly available or there is no evidence indicating that the plaintiff undertook efforts to ensure the information's secrecy." *Safety Test & Equip. Co. v. Am. Safety Util. Corp.*, 2015 NCBC LEXIS 40, at *26 (N.C. Super. Ct. Apr. 23, 2015) (citing *Bank Travel Bank v. McCoy*, 802 F. Supp. 1358, 1360 (E.D.N.C. 1992)). Here, however, the Court concludes that TaiDoc has presented sufficient evidence, viewed in the light most favorable to TaiDoc, that the information it seeks to protect was not publicly available and that TaiDoc took reasonable measures to maintain the secrecy of that information.

{29}    First, OK Biotech's argument that TaiDoc lost ownership of its trade secret information contained in 510(k) filings as a matter of law by failing to use the FDA's Master File process is without merit. OK Biotech has offered evidence that

because a 510(k) often contains a non-submitting manufacturer's (here, TaiDoc's) confidential and/or trade secret information, the FDA offers a Master File process that permits the FDA's confidential review of the information, without providing the 510(k) submitter (here, DDI) access to that information through a FOIA request.[3] (Def.'s Mot. Summ. J. App. Ex. 22.) In submitting the 510(k)s in DDI's name here, however, it appears that TaiDoc did not use this Master File process. TaiDoc argues in response that the Master File process is not mandatory, and, in any event, TaiDoc did not need to protect its trade secrets through the Master File process because DDI had agreed to maintain the confidentiality of the 510(k) information through its oral agreements with TaiDoc and in the SEA.

{30}    Without more, the Court cannot conclude as a matter of law that TaiDoc lost ownership of its trade secret information or otherwise failed to take reasonable measures to maintain the secrecy of that information by failing to use the Master File process or by submitting the 510(k) in DDI's name.

{31}    It does not appear that federal statutes or regulations define or otherwise determine a right of ownership in the confidential information appearing in a 510(k). The 510(k) process appears solely focused on whether a medical device is "substantially equivalent" to a prior device and thus whether further information must be disclosed to protect the health and safety of consumers. 21 CFR § 807.92(a)(3). As a result, the Court cannot conclude, as a matter of federal law, that the TaiDoc information contained in the 510(k)s submitted under DDI's name is not owned by TaiDoc.

{32}    Similarly, the Court cannot conclude, as a matter of North Carolina law,[4] that the information TaiDoc incorporated into the 510(k)s was not owned by TaiDoc

---

[3] FOIA requests to the FDA are subject to 5 U.S.C. § 552(b)(4) and 21 C.F.R. § 20.61(c), which provide for an exemption from disclosure to the general public for trade secrets and other confidential information. *Id.* ("Data and information submitted or divulged to the [FDA] which fall within the definitions of a trade secret . . . are not available for public disclosure.").

[4] In the absence of federal law, the Court concludes that the ownership rights in the information set forth in the 510(k)s should be determined by state law. *See, e.g.*, *Jim Arnold Corp. v. Hydrotech Sys., Inc.*, 109 F.3d 1567, 1571 (Fed. Cir. 1997) (under federal patent law, "the question of who owns the patent rights and on what terms typically is a question for state courts").

or that TaiDoc intended to transfer its ownership rights in that information to DDI. Indeed, OK Biotech has not offered evidence of an express assignment or sale of any such rights, any provision in the SEA or other agreement conveying such rights, or any communications between the parties suggesting the parties' intended that DDI was to receive such rights at any time. In contrast, TaiDoc points to statements and actions of DDI's principals and agents suggesting that TaiDoc owned its trade secret information in the 510(k)s and never intended to transfer, and in fact did not transfer, ownership of its trade secrets at any time. (Pl.'s Resp. Br. 27).

{33} Moreover, in addition to its alleged oral agreement with DDI and the SEA, TaiDoc points to a variety of measures it took to protect the confidential information it included in the 510(k)s, including exchanging draft agreements containing confidentiality provisions beginning in October 2005, affixing confidentiality labels on documents sent to DDI, requiring DDI to sign confidentiality acknowledgments on every page of all 510(k)s, requiring a non-disclosure agreement with DDI's consultant prior to disclosing TaiDoc information, and never providing a copy of any 510(k) to DDI at any time. (Pl.'s Resp. Br. 18–19). *See generally Koch Measurement Devices, Inc. v. Armke*, 2015 NCBC LEXIS 45, at *15 (N.C. Super. Ct. May 1, 2015) (whether plaintiff undertook "reasonable efforts" to "safeguard the secrecy of [trade secrets]" is "necessarily fact dependent, and courts that have addressed it closely examine the circumstances surrounding the trade secret to determine what measures are reasonable.").[5]

{34} Next, the Court finds unpersuasive OK Biotech's argument that TaiDoc lost trade secret protection as a matter of law because TaiDoc provided alleged trade secret information to DDI before there was a written confidentiality

---

[5] TaiDoc asserts that it "does not claim trade secret protection for anything that is not actually redacted or which would have been redacted but for FDA error." (Pl.'s Resp. Br. 20.) OK Biotech argues that one of the documents for which TaiDoc claims trade secret protection, an Interference Test associated with a 510(k), is no longer a trade secret because it was not redacted by the FDA in response to a FOIA request and thus was made publicly available. The Court cannot conclude as a matter of law that TaiDoc failed to maintain appropriate secrecy efforts concerning this document, however, because there is no evidence that this document was delivered to any person or entity other than DDI, which, as noted above, had confidentiality obligations to TaiDoc by alleged oral agreement and under the SEA.

agreement in place between the parties. Despite the absence of a formal written confidentiality agreement prior to the SEA, TaiDoc has presented evidence that TaiDoc and DDI discussed TaiDoc's requirement that TaiDoc's information be kept confidential and that TaiDoc's and DDI's business relationship prior to entering into the SEA included oral agreements to maintain the confidentiality of TaiDoc's information. (Chen Aff. ¶ 24.) Additionally, TaiDoc's pre-SEA 510(k) filings required DDI to sign an acknowledgement recognizing that the contents of the filings were confidential.[6] (Pl.'s Dep. Ex. 109.) Based on this record, the Court cannot conclude that the lack of a written confidentiality agreement at the time of TaiDoc's initial transfer of information to DDI establishes TaiDoc's failure to maintain reasonable measures to maintain the secrecy of its trade secrets as a matter of law. *See Static Control Components, Inc. v. Darkprint Imaging, Inc.*, 200 F. Supp. 2d 541, 546 (M.D.N.C. 2002) (applying North Carolina law and concluding that "[a]lthough confidentiality agreements are one method to protect confidential information, they are by no means the sole method").

{35} Finally, the Court concludes that OK Biotech's contention that TaiDoc waived trade secret protection as a matter of law by allowing its alleged trade secret information to be disclosed to third parties without restrictions on its further disclosure is without merit. OK Biotech presents only one instance in which TaiDoc provided DDI with information it now alleges to be trade secret—two pages of a document, each marked "confidential," which TaiDoc provided to DDI at DDI's request for forwarding to a potential customer, the United States Air Force. Courts do not require absolute secrecy at all times and in all circumstances to maintain trade secret protection. *See, e.g., Metallurgical Indus. v. Fourtek, Inc.*, 790 F.2d 1195, 1200 (5th Cir. 1986) (holding that a limited disclosure of trade secret information, especially to a potential customer, does not destroy the information's status as a trade secret); *Koch Measurement Devices, Inc.*, 2015 NCBC LEXIS 45,

---

[6] The acknowledgement read: "**Confidentiality**: DIANOSTICS [sp.] DEVICES, INC. considers the information contained in this submission to be confidential in nature (except for 510(k) summary as required by SMDA)."

at *15 (requiring "reasonable efforts" to "safeguard the secrecy of [trade secrets]"). The Court cannot conclude here, particularly when the two pages were marked "confidential" and distributed only to a potential customer, that this single instance necessarily requires the conclusion that TaiDoc did not take reasonable efforts to maintain the secrecy of the information for which it claims trade secret protection. *See, e.g., Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 664 (4th Cir. 1993) (applying Maryland law and holding that Plaintiff's limited disclosure to, at most, three outsiders, two of whom had licensed the product, did not destroy secrecy).

{36} As a result, whether TaiDoc's contentions and evidence are considered separately or together, the Court cannot conclude as a matter of law that TaiDoc failed to take reasonable measures to maintain the secrecy of its confidential information.

    ii.    OK Biotech's Alleged Misappropriation

{37} OK Biotech next argues that TaiDoc cannot show that OK Biotech misappropriated its trade secrets. Misappropriation is defined under the TSPA as the "acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent, unless such trade secret was arrived at by independent development, reverse engineering, or was obtained from another person with a right to disclose the trade secret." N.C. Gen. Stat. § 66-152(1).

> Misappropriation of a trade secret is established by introducing substantial evidence that the person against whom relief is sought: "(1) Knows or should have known of the trade secret; and (2) Has had a specific opportunity to acquire it for disclosure or use or has acquired, disclosed, or used it without the express or implied consent or authority of the owner."

*Byrd's Lawn & Landscaping, Inc. v. Smith*, 142 N.C. App. 371, 376, 542 S.E.2d 689, 693 (2001) (quoting N.C. Gen. Stat. § 66-155).

{38} OK Biotech contends that there is no evidence that OK Biotech knew that DDI provided it information owned by TaiDoc or anyone other than DDI and thus that TaiDoc's claim must necessarily fail. The Court disagrees. For example, the very first document that OK Biotech received from DDI in the parties' initial

discussions expressly contained the following label: "This document was prepared by TaiDoc Technology Corporation and contains CONFIDENTIAL and PROPRIETARY information." (Pl.'s Dep. Ex. 6.) In addition, TaiDoc alleges that OK Biotech treats its own data submitted in a 510(k) as trade secrets in its business, (Pl.'s Sur-reply Opp. Def.'s Mot. Summ. J. Exs. A, B), permitting an inference that OK Biotech knew or should have known that the information in the 510(k)s at issue was TaiDoc's information and that this information was similarly confidential. The Court thus concludes that TaiDoc has presented sufficient evidence from which a jury could reasonably conclude that OK Biotech knew that TaiDoc owned at least some portion of the confidential information it received from DDI.

{39} OK Biotech also argues that the record does not show that it ever used TaiDoc's information. Again, however, the record contains evidence from which a jury could reasonably conclude to the contrary. First, "defendant[] need not be using the *same exact* process as plaintiff in order to be found liable for misappropriating plaintiff's trade secrets. Rather, courts have found misappropriation where the substance of the new process is derived from another's secret." *BSN Med., Inc. v. Parker Med. Assocs. LLC*, No. 3:09cv15, 2011 U.S. Dist. LEXIS 130643, at *48 (W.D.N.C. Nov. 9, 2011) (applying North Carolina law). Thus, TaiDoc is not required to show that OK Biotech's meters and strips were identical to its own; rather, TaiDoc need only show at this stage that there is a question of material fact as to whether OK Biotech acquired or used its alleged trade secret information. TaiDoc has clearly met its burden. Viewed in the light most favorable to TaiDoc, a jury could reasonably conclude that there is evidence that OK Biotech acquired or used the 510(k)s prepared by TaiDoc as well as information obtained from TaiDoc's lab. (Abulhaj Dep. 38:9–17, 42:9–17, 52:23–53:14; Lin Aff. ¶¶ 15–16.) There is also evidence that DDI sent TaiDoc's test strips material to OK Biotech twice, each time with specific instructions that OK Biotech's chemistry must be the "same" as TaiDoc's chemistry. (Lin Aff. ¶ 15.) The Court

concludes that this and other evidence is sufficient to permit a jury to reasonably conclude that OK Biotech acquired or used TaiDoc's trade secrets.

{40} For each of these reasons, the Court concludes that OK Biotech's Motion seeking dismissal of TaiDoc's claim for misappropriation of trade secrets should be denied.

B.    Civil Conspiracy/Facilitating Fraud/Aiding and Abetting Fraud

{41} TaiDoc's first three claims for relief in its Complaint are for "fraud (liability as a co-conspirator)" (Count 1), "facilitating fraud" (Count 2), and "aiding and abetting fraud" (Count 3). Count 1 asserts that "OK Biotech is liable to TaiDoc for DDI's fraud and damages caused thereby as a co-conspirator with DDI." (Compl. ¶ 82.) Count 2 alleges that "OK Biotech conspired and agreed with DDI" to "facilitate[] and aid[] and abet[] DDI's fraud," (Compl. ¶ 84), and Count 3 asserts that "OK Biotech aided and abetted DDI's fraud that caused damage to TaiDoc." (Compl. ¶ 90.)

{42} To recover for civil conspiracy, TaiDoc is required to show: "(1) an agreement between two or more persons to do a wrongful act; (2) an overt act committed in furtherance of the agreement; and (3) damage to the plaintiff." *Pleasant Valley Promenade v. Lechmere, Inc.*, 120 N.C. App. 650, 657, 464 S.E.2d 47, 54 (1995). However, proof of the civil conspiracy

> does no more than associate the defendants together . . . . The gravamen of the action is the resultant injury, and not the conspiracy itself. To create civil liability for conspiracy there must have been a wrongful act resulting in injury to another committed by one or more of the conspirators pursuant to the common scheme and in furtherance of the objective.

*Henry v. Deen*, 310 N.C. 75, 87, 310 S.E.2d 326, 334 (1984) (internal citations omitted).

{43} "A cause of action for facilitation of fraud, a type of conspiracy, has been recognized in this jurisdiction." *State ex rel. Long v. Petree Stockton, L.L.P.*, 129 N.C. App. 432, 447, 499 S.E.2d 790, 799 (1998). "While there is no recognized action for civil conspiracy in North Carolina, and [a claim for facilitating fraud] is couched

in the language of conspiracy, our law nevertheless permits one defrauded to recover from anyone who facilitated the fraud by agreeing for it to be accomplished." *Nye v. Oates*, 96 N.C. App. 343, 346–47, 385 S.E.2d 529, 531 (1989) (internal citation omitted). "The elements of facilitating fraud are: (1) that the defendants agreed to defraud plaintiff; (2) that defendants committed an overt tortious act in furtherance of the agreement; and (3) that plaintiff suffered damages from that act." *Neugent v. Beroth Oil Co.*, 149 N.C. App. 38, 53, 560 S.E.2d 829, 839 (2002). Thus, where, as here, the object of the parties' alleged agreement is to defraud another, a claim for civil conspiracy to commit fraud and a claim for facilitating fraud are essentially the same claim. *See generally Estate of Capps v. Blondeau*, 2015 NCBC LEXIS 41, at *22–23 (N.C. Super. Ct. Mar. 5, 2015).[7]

{44} Although "direct evidence of a conspiracy agreement is not necessary," *Lechmere*, 120 N.C. App. at 657, 464 S.E.2d at 54, circumstantial evidence of the agreement "must be sufficient to create more than a suspicion or conjecture in order to justify submission of the issue to a jury," *Dickens v. Puryear*, 302 N.C. 437, 456, 276 S.E.2d 325, 337 (1981). On a motion for summary judgment, the non-movant must "come forward with facts, as distinguished from allegations, sufficient to indicate he will be able to sustain his claim at trial." *Id.* "When a cause of action lies for injury resulting from conspiracy, all of the conspirators are liable, jointly and severally, for the act of any one of them done in furtherance of the agreement." *State ex rel. Long*, 129 N.C. App. at 447, 499 S.E.2d at 799 (citation and quotation marks omitted).

---

[7] This Court has noted on several occasions that "[n]o North Carolina state court has recognized a claim for aiding and abetting fraud," *Bradshaw v. Maiden*, 2015 NCBC LEXIS 80, at *37 (N.C. Super. Ct. Aug. 10, 2015) (quoting *Branch Banking & Trust Co. v. Lighthouse Fin. Corp.*, 2005 NCBC LEXIS 4, at *22 (N.C. Super. Ct. July 13, 2005)), and has opined that "the North Carolina courts should not recognize a claim for aiding and abetting fraud," *Branch Banking & Trust Co.*, 2005 NCBC LEXIS 4 at *22, because such a claim cannot be distinguished from a direct fraud claim. *See Sompo Japan Ins., Inc. v. Deloitte & Touche, LLP*, 2005 NCBC LEXIS 1, at *9–10 (N.C. Super. Ct. June 10, 2005) ("There must be direct knowledge and intent to defraud [for a claim for aiding and abetting fraud]. If that is required, the claims are redundant."). The Court declines to recognize such a claim in the circumstances here, particularly because, as pleaded here, the claim is identical to TaiDoc's claims for civil conspiracy to commit fraud and facilitating fraud.

{45} OK Biotech argues that TaiDoc has not brought forward sufficient evidence of an agreement to commit a wrongful act. In response, TaiDoc offers evidence in the form of minutes from meetings held between DDI and OK Biotech, (*e.g.*, Pl. Dep. Exs. 14, 16), written agreements between DDI and OK Biotech, (*e.g.*, Pl. Dep. Exs. 19, 20), and various e-mail communications (*e.g.*, Pl. Dep. Ex. 49), which, TaiDoc argues, shows that OK Biotech and DDI agreed to (i) obtain and use TaiDoc's confidential and trade secret information, (ii) intentionally deceive TaiDoc into believing that its relationship with DDI was strong enough to merit TaiDoc's participation in preparing and filing a new 510(k) for DDI, (iii) acquire and use the new TaiDoc-prepared 510(k) to market products manufactured by OK Biotech, (iv) facilitate DDI's breach of the SEA, and (v) keep their partnership a secret from TaiDoc to induce TaiDoc to continue manufacturing products for DDI until OK Biotech was in a position to replace TaiDoc as DDI's supplier.

{46} OK Biotech argues that this evidence shows no more than an ordinary business relationship with DDI to become a supplier of glucose strips and meters and, as such, is insufficient circumstantial evidence to establish an agreement to perform a wrongful act. *See BDM Invs. v. Lenhil, Inc.* 2014 NCBC LEXIS 6, at *45–46 (N.C. Super. Ct. Mar. 20, 2014) (concluding that evidence of defendants' interactions during the course of an ordinary business transaction, even when one defendant improperly failed to disclose a relationship with some of the other defendants, without evidence of other unlawful conduct, did not rise above "suspicion or conjecture" of an unlawful agreement).

{47} Viewing the evidence TaiDoc advances in the light most favorable to TaiDoc, it appears to the Court that TaiDoc has brought forward evidence suggesting that: (i) OK Biotech and DDI referred to their relationship as a "partnership," (Pl. Dep. Ex. 49); (ii) OK Biotech asked DDI for TaiDoc's price and code information, (Pl. Dep. Ex. 42); (iii) DDI instructed OK Biotech that OK Biotech's strip should "keep the same look and design" as TaiDoc's strip, (Pl. Dep. Ex. 42); (iv) OK Biotech indicated that it could "do the same products [as TaiDoc] if based on production technology," (Pl. Dep. Ex. 45.); (v) DDI advised OK Biotech that

"our job [was] to "kill TaiDoc," (Pl. Dep. Ex. 23); (vi) minutes of meetings between DDI and OK Biotech stated that their mutual goal was to "target win over TaiDoc," (Pl. Dep. Ex. 14); and (vii) DDI e-mailed OK Biotech "chemistry that Taidoc claims in our 510(k)" in an effort to make certain that OK Biotech used the same chemistry in its competing strips, (Pl. Dep. Ex. 81). While each piece of evidence, on its own, may not rise above the level of "mere suspicion or conjecture" of an unlawful agreement, the Court concludes that the forecast of this and other evidence, taken together, creates an issue of material fact as to whether DDI and OK Biotech entered into an agreement to commit a wrongful act. *See GoRhinoGo, LLC v. Lewis*, 2011 NCBC LEXIS 39, at \*18 (N.C. Super. Ct. Sept. 29, 2011) (citing *Terry's Floor Fashions, Inc. v. Burlington Indus., Inc.*, 568 F. Supp. 205, 210 (E.D.N.C. 1983)) ("Behavior that may be benign or innocuous when standing alone can acquire a different meaning when placed in a larger context.").

{48} The Court also concludes that TaiDoc has offered sufficient evidence of overt acts by DDI and OK Biotech in furtherance of the alleged conspiracy between them to sustain TaiDoc's conspiracy claim. In particular, TaiDoc offers evidence of DDI's alleged fraudulent misrepresentations, including evidence that one day after writing to OK Biotech that "we are quite excited . . . that we [now] have a strong partner to allow us to take over the market," (Pl. Dep. Ex. 153), DDI negotiated a second addendum to the SEA with TaiDoc, and that, while TaiDoc was working to prepare the Third 510(k), which it did at DDI's request and upon DDI's affirmation that it was committed to its business relationship with TaiDoc, DDI had already formed its relationship with OK Biotech to replace TaiDoc, (2d Chen Aff. ¶¶ 16–17). TaiDoc also offers evidence of DDI's alleged breach of its confidentiality obligations under the SEA and DDI's alleged misappropriation of TaiDoc's trade secrets, actions TaiDoc contends DDI took pursuant to its conspiracy with OK Biotech and which resulted in causing TaiDoc substantial damages.

{49} Accordingly, the Court concludes that OK Biotech's Motion should be denied as to TaiDoc's claim for civil conspiracy.

C.    Tortious Interference with Contract

{50}    The elements of a claim for tortious interference with contract are well-established:

> To establish a claim for tortious interference with contract, a plaintiff must show: (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff.

*Bev. Sys. of the Carolinas, LLC v. Associated Bev. Repair, LLC*, 762 S.E.2d 316, 323 (N.C. Ct. App. 2014) (citation omitted), *rev'd on other grounds*, 2016 N.C. LEXIS 177 (N.C. 2016).

{51}    TaiDoc claims OK Biotech induced DDI to breach the confidentiality and exclusivity provisions of the SEA.  OK Biotech contends that TaiDoc has offered no evidence that OK Biotech knew about the SEA or its confidentiality or exclusivity provisions, at least until January 17, 2009, after which the SEA had expired and had no further force or effect.  Contrary to OK Biotech's assertions, however, the Court concludes that there is ample evidence in the record from which a jury could reasonably conclude that OK Biotech had knowledge of the SEA and the SEA's confidentiality and exclusivity provisions before and after January 17, 2009.

{52}    In particular, TaiDoc has forecasted evidence that, no later than September 24, 2007, OK Biotech knew that: (i) TaiDoc was DDI's sole supplier; (ii) TaiDoc labeled documents it gave to DDI as confidential; (iii) OK Biotech considered similar information used in its own business to be confidential; and (iv) OK Biotech had signed its own non-disclosure agreement with DDI.  In addition, there is evidence that by January 17, 2009, OK Biotech knew the terms of the confidentiality provision contained in the SEA, and TaiDoc offers evidence suggesting that, while the SEA had expired by January 2009, the parties' intended that the confidentiality obligation in the SEA would extend beyond the expiration of the SEA.  Our courts have observed that "[t]he outsider has knowledge of the contract within the meaning of the second element of the tort if he knows the facts

which give rise to the plaintiff's contractual right against the third person." *Reichhold Chems., Inc. v. Goel*, 146 N.C. App. 137, 151, 555 S.E.2d 281, 290 (2001). The Court concludes that, based on the evidence outlined above, a jury could reasonably conclude that OK Biotech knew DDI had a contractual duty to maintain the confidentiality of TaiDoc's trade secret information at and after the time it received it.

{53} OK Biotech next argues that TaiDoc cannot show that OK Biotech intentionally induced DDI not to perform under the SEA. In particular, OK Biotech argues that because DDI approached OK Biotech to manufacture meters and strips, OK Biotech cannot be found to have intentionally induced DDI not to perform under the SEA. *See Collins Entm't Corp. v. Drews Distrib., Inc.*, No. 98-1083, 1999 U.S. App. LEXIS 3712, at *12–13 (4th Cir. Mar. 9, 1999) (unpublished) (no intentional procurement of breach where evidence showed third party sought out defendant, not vice versa) (applying substantially similar South Carolina law). The Court concludes, however, that regardless of the source of the original solicitation, TaiDoc has offered evidence from which a jury could reasonably conclude that thereafter OK Biotech, with knowledge that DDI had confidentiality and exclusivity obligations to TaiDoc, intentionally induced DDI to breach those agreements. For example, TaiDoc has offered evidence that in September 2007, OK Biotech requested from DDI confidential information of TaiDoc, including samples of meters and strips, circuit diagrams, flow charts, and code data. (Pl. Dep. Ex. 39.) The documents OK Biotech received from DDI in response to these requests were clearly labeled confidential. (Pl. Dep. Ex. 6.) Also in September 2007, OK Biotech asked DDI to learn and provide TaiDoc's pricing information. (Pl. Dep. Ex. 42.) The Court concludes that a jury could reasonably find from these facts that OK Biotech intentionally induced DDI's breach of the SEA.

{54} OK Biotech also argues that its alleged interference constitutes justifiable interference. The North Carolina Supreme Court has held that if the defendant's interference is "for a legitimate business purpose, his actions are privileged. . . . [C]ompetition in business constitutes justifiable interference in another's business

relations and is not actionable so long as it is carried on in furtherance of one's own interests and by means that are lawful." *Peoples Sec. Life Ins. Co. v. Hooks*, 322 N.C. 216, 221, 367 S.E.2d 647, 650 (1988). This "privilege [to interfere] is conditional or qualified; that is, it is lost if exercised for a wrong purpose. In general, a wrong purpose exists where the act is done other than as a reasonable and *bona fide* attempt to protect the interest of the defendant which is involved." *Id.* at 220, 367 S.E.2d at 650 (citation and quotation marks omitted). "The interference is 'without justification' if the defendant['s] motives for procuring termination of the . . . contract were 'not reasonably related to the protection of a legitimate business interest' of the defendant." *Privette v. Univ. of N.C.*, 96 N.C. App. 124, 134, 385 S.E.2d 185, 190 (1989).

{55} The Court concludes that TaiDoc has presented evidence which, if proven, could permit a jury to reasonably conclude that OK Biotech's conduct was not merely a reasonable and bona fide attempt to protect its own legitimate business interests but rather was accomplished through unlawful means and intended to harm TaiDoc's business. In particular, TaiDoc has presented evidence suggesting that OK Biotech, rather than attempting to work with DDI to independently develop its own glucose meters and test strips to compete with TaiDoc, instead requested and used TaiDoc's confidential and trade secret information on numerous occasions to attempt to develop meters and strips that were essentially identical to TaiDoc's without notice to TaiDoc in an effort to harm TaiDoc's business.

{56} For these reasons, the Court concludes that OK Biotech's Motion should be denied as to TaiDoc's claim for tortious interference with contract.

D.     Tortious Interference with Prospective Economic Advantage

{57} "To establish tortious interference with prospective economic advantage, a plaintiff must show that the defendant, without justification, induced a third party to refrain from entering into a contract with the plaintiff, which would have been made absent the defendant's interference." *MLC Auto., LLC v. Town of S. Pines*, 207 N.C. App. 555, 571, 702 S.E.2d 68, 79 (2010). TaiDoc has failed to offer evidence identifying a specific contract that a third party was induced not to enter

with TaiDoc. Accordingly, the Court concludes that this claim should be dismissed with prejudice. *See, e.g.*, *McElmurry v. Alex Fergusson, Inc.*, No. 04CV389, 2006 U.S. Dist. LEXIS 10760, at *53 (M.D.N.C. Mar. 8, 2006) ("[Plaintiff's mere expectation of future contracts with [potential customers] is not enough to maintain a tortious interference with prospective advantage claim [under North Carolina law].").

E.     Unfair and Deceptive Trade Practices

{58}     OK Biotech's only argument for dismissing TaiDoc's section 75-1.1 claim is that the claims upon which the section 75-1.1 claim is based—civil conspiracy, misappropriation of trade secrets, and tortious interference with contract—should fail and, thus, so should the section 75-1.1 claim. The Court has concluded, however, that TaiDoc's claims for civil conspiracy, misappropriation of trade secrets, and tortious interference with contract should survive at this stage. Accordingly, the Court denies OK Biotech's Motion as to TaiDoc's UDTP claim. *See, e.g.*, *Akzo Nobel Coatings, Inc. v. Rogers*, 2011 NCBC LEXIS 42, at *65 (N.C. Super. Ct. Nov. 3, 2011) (declining to dismiss section 75-1.1 claim because predicate misappropriation claim survived dismissal).

F.     Unjust Enrichment

{59}     In order to recover on a claim for unjust enrichment, a plaintiff must show: "(1) a measurable benefit was conferred on the defendant, (2) the defendant consciously accepted that benefit, and (3) the benefit was not conferred officiously or gratuitously." *Primerica Life Ins. Co. v. James Massengill & Sons Constr. Co.*, 211 N.C. App. 252, 259–60, 712 S.E.2d 670, 677 (2011). TaiDoc asserts that (i) it prepared its Third 510(k) with the expectation that it would be used exclusively to market TaiDoc products for TaiDoc's profit, (ii) OK Biotech did not contribute to the development of information for the 510(k), and (iii) OK Biotech has been unjustly enriched by marketing its products under the 510(k) since 2008.

{60}     OK Biotech's only argument in support of its Motion is that the claim must fail without a finding that OK Biotech misappropriated TaiDoc's trade secrets.

Because the Court has declined to dismiss TaiDoc's trade secrets claim, the Court therefore declines to dismiss TaiDoc's claim for unjust enrichment.

G. Statutes of Limitations

{61} Separate and apart from its contentions that TaiDoc's claims are fatally deficient as a matter of law, OK Biotech argues that each claim, other than TaiDoc's claim under section 75-1.1, is time-barred.[8] "Once a defendant has properly pleaded the statute of limitations, the burden is then placed upon the plaintiff to offer a forecast of evidence showing that the action was instituted within the permissible period after the accrual of the cause of action." *Pembee Mfg. Corp. v. Cape Fear Constr. Co.*, 313 N.C. 488, 491, 329 S.E.2d 350, 353 (1985) (citing *Little v. Rose*, 285 N.C. 724, 208 S.E.2d 666 (1974)). Nonetheless, "the party moving for summary judgment ultimately has the burden of establishing the lack of any triable issue of fact." *Id.* (citing *Texaco, Inc. v. Creel*, 310 N.C. 694, 314 S.E.2d 506 (1984)).

{62} As an initial matter, TaiDoc argues that the statute of limitations for all claims asserted in this action were tolled when TaiDoc filed the Federal Action on May 10, 2012. North Carolina courts hold that filing an action in federal court "toll[s] the statute of limitations on a claim which is based on state substantive law." *Clark v. Velsicol Chem. Corp.*, 110 N.C. App. 803, 808, 431 S.E.2d 227, 229 (1993). TaiDoc filed the Federal Action in Pennsylvania on May 10, 2012, and commenced this action on November 16, 2012 while the federal lawsuit was still pending.

{63} The Federal Action, however, asserted federal claims not present in the current action, and TaiDoc's state law claims in the Federal Action were specifically asserted under Pennsylvania law, (Pl.'s Resp. Br. Ex. 3 ¶¶ 76, 89, 101, 110, 120, 128), while its claims in this action are asserted under North Carolina law. Accordingly, because the state law claims pleaded in this action were not the claims pleaded in the Federal Action, the Court concludes that the statute of limitations on

---

[8] OK Biotech does not contend that TaiDoc's claim for violation of N.C. Gen. Stat. § 75-1.1, which is subject to a four-year statute of limitations, is time-barred. *See* N.C. Gen. Stat. § 75-16.2. All of TaiDoc's other claims are tort claims subject to a three-year statute of limitations. *See* N.C. Gen. Stat. §§ 1-52, 66-157.

TaiDoc's state law claims asserted in this lawsuit were not tolled as of the filing of the Federal Action.

      i.      Tortious Interference and Unjust Enrichment Claims

{64}   Because the claims in this action were asserted on November 16, 2012, TaiDoc's claims for tortious interference and unjust enrichment must have accrued on or after November 16, 2009 to be actionable. OK Biotech argues that TaiDoc's tortious interference and unjust enrichment claims accrued no later than August 2008, when OK Biotech allegedly used TaiDoc's confidential and trade secret information in developing and manufacturing test strips and meters. TaiDoc, on the other hand, argues that although there is no express discovery provision contained in N.C. Gen. Stat. § 1-52(5), the claims should begin to accrue when TaiDoc was put on notice of the wrong, not when the wrong actually occurred.

{65}   North Carolina law is clear that a plaintiff seeking damages for tortious interference with contract or prospective economic advantage "must assert that claim within three years of the date upon which the underlying injury occurred." *Glynne v. Wilson Med. Ctr.*, 762 S.E.2d 645, 649 (N.C. Ct. App. 2014) (citing N.C. Gen. Stat. § 1-52(5)). Similarly, claims for unjust enrichment are governed by a three-year statute of limitations. *Housecalls Home Health Care, Inc. v. State*, 200 N.C. App. 66, 70, 682 S.E.2d 741, 744 (2009). "[T]he period of the statute of limitations begins to run when the plaintiff's right to maintain an action for the wrong alleged accrues. The cause of action accrues when the wrong is complete, even though the injured party did not then know the wrong had been committed." *Id.* (citation omitted). TaiDoc presents no North Carolina case in which the court has applied a "notice" or "discovery" rule to tortious interference or unjust enrichment claims, and this Court declines to do so now.

{66}   TaiDoc does not otherwise contest that its claims accrued before November 16, 2009, but nonetheless argues that either equitable estoppel or the continuing wrong doctrine should preclude application of the statute of limitations.

{67}   The doctrine of equitable estoppel, which may be invoked to bar a defendant from relying on a statute of limitations defense, "arises when an

individual by his acts, representations, admissions or silence, when he has a duty to speak, intentionally or through culpable negligence, induces another to believe that certain facts exist and that other person rightfully relies on those facts to his detriment." *Miller v. Talton*, 112 N.C. App. 484, 488, 435 S.E.2d 793, 797 (1993). Here, TaiDoc acknowledges that OK Biotech, itself, did not do or make any act, representation, or admission that induced TaiDoc's reliance. However, TaiDoc argues that because TaiDoc's delay in asserting these claims was due to the refusal of OK Biotech's co-conspirator, DDI, to produce documents in litigation commenced as part of the conspiracy, equity should intervene and estop OK Biotech from asserting the statute of limitations here.

{68}   The Court finds this argument unpersuasive. TaiDoc's claims for tortious interference with contract, tortious interference with prospective economic advantage, and unjust enrichment are not based on the alleged conspiracy between OK Biotech and DDI. Rather, TaiDoc seeks to hold OK Biotech directly liable for these alleged wrongs. Whether or to what extent DDI acted to delay TaiDoc in asserting its direct claims against OK Biotech is irrelevant to a determination of whether OK Biotech should be equitably estopped from asserting the statute of limitations.

{69}   Finally, TaiDoc asserts that the continuing wrong doctrine precludes application of the statute of limitations to these claims. The North Carolina Supreme Court has recognized "the 'continuing wrong' or 'continuing violation' doctrine as an exception to the general rule" that a cause of action accrues when the right to bring a lawsuit arises. *Williams v. Blue Cross Blue Shield*, 357 N.C. 170, 178–79, 581 S.E.2d 415, 423 (2003). "When this doctrine applies, a statute of limitations does not begin to run until the violative act ceases. A continuing violation is occasioned by continual unlawful acts, not by continual ill effects from an original violation." *Id.* at 179, 581 S.E.2d at 423. (quotation marks and citations omitted). Our courts have made it clear that "the continuing wrong doctrine is not easily invoked." *Soft Line, S.p.A v. Italian Homes, LLC*, 2015 NCBC LEXIS 6, at *29 (N.C. Super. Ct. Jan. 16, 2015).

{70} Although OK Biotech argues otherwise, the Court concludes that TaiDoc has proffered sufficient evidence to raise a genuine issue of material fact as to whether OK Biotech continued to commit acts on and after November 16, 2009 that constitute tortious interference with contract or give rise to a claim for unjust enrichment. In particular, TaiDoc offers evidence that OK Biotech induced DDI to breach the SEA by disclosing TaiDoc's trade secrets in August 2011, (Pl.'s Dep. Ex. 12), and by selling the 510(k)s containing TaiDoc's confidential information to OK Biotech in December 2012. (Pl.'s Dep. Ex. 18). TaiDoc also offers evidence that OK Biotech continued to be unjustly enriched after November 16, 2009 through its manufacture and sale of products to DDI using TaiDoc's confidential information after that date. Accordingly, the Court concludes that it is for a jury to determine the facts on which OK Biotech's continuing wrong defense rests.

ii.    Civil Conspiracy and Misappropriation of Trade Secrets

{71} Unlike TaiDoc's tortious interference and unjust enrichment claims, its claims for misappropriation of trade secrets and the underlying acts for which TaiDoc asserts liability for civil conspiracy accrue "upon discovery by the plaintiff of facts" constituting the wrong. *Carlisle v. Keith*, 169 N.C. App. 674, 683, 614 S.E.2d 542, 548 (2005); *see also* N.C. Gen. Stat. §§ 66-157, 1-52(9).

> 'Discovery' is defined as actual discovery or the time when the fraud should have been discovered through the exercise of due diligence. . . . Whether a plaintiff has exercised due diligence is ordinarily an issue of fact for the jury absent dispositive or conclusive evidence indicating neglect by the plaintiff as a matter of law.

*Spears v. Moore*, 145 N.C. App. 706, 708, 551 S.E.2d 483, 485 (2001) (citations omitted).

{72} OK Biotech argues that TaiDoc either knew of or had the opportunity to discover the basic facts underlying its claims in 2008 because (i) it discovered that DDI was purchasing meters and strips from a competing manufacturer, (ii) it knew that OK Biotech was the competing manufacturer, and (iii) TaiDoc knew that OK Biotech was incapable of manufacturing strips and meters without TaiDoc's confidential and trade secret information. TaiDoc responds that the mere fact that

it knew in 2008 that OK Biotech was manufacturing strips and meters for DDI does not establish that it knew or should have known that OK Biotech was using its confidential and trade secret information, and offers evidence that it did not discover OK Biotech's alleged misappropriation nor DDI's fraud until 2011. The Court concludes that the parties' competing proofs create an issue of material fact that the Court may not resolve at summary judgment.

V.

CONCLUSION

{73}    For the foregoing reasons, the Court hereby **DENIES** OK Biotech's Motion for Summary Judgment as to all claims, except that the Court **GRANTS** OK Biotech's Motion as to TaiDoc's claims for tortious interference with prospective economic advantage and aiding and abetting fraud, which claims are hereby **DISMISSED** with prejudice.

**SO ORDERED**, this 28th day of March, 2016.


/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Special Superior Court Judge
  for Complex Business Cases